# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### COOKEVILLE DIVISION

| | | |
|---|---|---|
| **PHILLIP DAVID OLMSTEAD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 2:16-cv-00046** |
| | ) | **CHIEF JUDGE CRENSHAW** |
| **FENTRESS COUNTY, TN, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This action arises from allegations that Phillip David Olmstead, a former prisoner at the Fentress County Justice Center ("FCJC"), did not receive proper treatment for high blood pressure resulting in vision problems in one eye. Olmstead brings a federal claim, pursuant to 42 U.S.C. § 1983, of deliberate indifference to a serious medical need in violation of the Eighth Amendment to the U.S. Constitution, as well as a state law claim of intentional infliction of emotional distress. The remaining defendants in this case are Fentress County, Tennessee; former Fentress County Sheriff Charles Cravens; Fentress County Correctional Officers ("CO") Nicole York, Josh Densmore, Tammy King, Chris Martin, and Gary Stockton; FCJC Administrator Candy Price; FCJC-contracted medical provider Southern Health Partners, Inc. ("SHP"); and SHP Licensed Practical Nurse Anthony Martin ("Nurse Martin").

Before the Court are four Motions for Summary Judgment. Specifically, separate motions have been filed by (1) Cravens (Doc. No. 239); (2) COs Densmore, Chris Martin, and York (Doc. No. 247); (3) Fentress County, Administrator Price, and COs Stockton and King (Doc. No. 250);

and (4) SHP and Nurse Martin (Doc. No. 245).[1] Olmstead filed an omnibus response in opposition (Doc. No. 270) and four replies were filed. (Doc. Nos. 273-276). The parties also filed separate statements of facts and numerous exhibits. (Doc. Nos. 242-1 to 242-3; 243-1; 245-1 to 245-13; 253-1 to 253-3; 254-1 to 254-6; 256-261; 265-269; 270-1 to 270-19; 277-1.) For the following reasons, the Motions will be granted.

I.    Facts[2]

---

[1] All the Fentress County Defendants are represented by the same counsel, yet they elected to file three overlapping motions for summary judgment that incorporate portions of each other by reference, in violation of the Court's published Judicial Preferences. See https://www.tnmd.uscourts.gov/sites/tnmd/files/JudicialPreferences.pdf (last accessed April 8, 2019).

[2] The Fentress County Defendants also filed three overlapping, but not identical, statements of undisputed material fact. This has greatly multiplied the work of the Court. Oddly, Olmstead has chosen to present his own additional "undisputed facts." Procedurally, Olmstead, as the party resisting summary judgment, should not be asserting additional *undisputed* facts, but rather additional *disputed* facts that entitle him to a trial. See Local Rule 56.01(c) ("In addition, the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried."); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial"). But, more importantly, the mechanism by which Olmstead does this blatantly violates Local Rule 56.01(c). A responding party is required to set forth each additional purportedly disputed fact "in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute. A copy of the statement of additional undisputed facts must also be provided to opposing counsel in an editable electronic format." (Id.) Olmstead has included 15 pages of additional "undisputed" facts, not set out in a concise, fact-by-fact format to allow responses by Defendants, but, rather, as a running narrative in a "fact" section of his consolidated opposition brief. This section includes Olmstead's additional "facts," but also arguments, conclusory statements and ill-chosen citations. Moreover, the citations are not even tied to any docket number for the Court or Defendants to reference (e.g., "Martin at 33"). Because Defendants have not had a proper opportunity to respond under Local Rule 56.01(d) to Olmstead's additional facts, the Court has given Olmstead's factual narrative no more weight than it is entitled. Finally, because there are multiple briefs and statements of material fact, for purposes of judicial economy, where more than one is similar the Court deems one citation to be sufficient. The Court discusses and relies on only record facts that are material and properly supported by the record.

Olmstead has high blood pressure. He filled prescriptions for the high blood pressure medications Clonidine and Lisinopril on March 19, 2015. (Doc. No. 245-3 at 2.) He then went to his primary care provider on March 23 and 30, 2015. (Doc. No. 245-2.) On March 23, 2015, Olmstead's blood pressure was measured at 170/130.[3] (Id. at 2.) The primary care provider prescribed Lisinopril and Metoprolol. (Id. at 2-3.) On March 30, 2015, Olmstead's blood pressure was tested at 224/140. (Doc. No. 245-2 at 6.) However, Olmstead did not complain of dizziness or vision problems. (Id.) This was not treated as an emergency and Olmstead was not transported to the hospital. (Id.) Instead, Olmstead's medication was adjusted by substituting Amlodipine for Lisinopril.[4] (Id. at 5-6.) Olmstead was told to follow-up in two weeks for re-evaluation. (Id.) He did not. (Doc. No. 245-2.) Olmstead filled no blood pressure prescriptions in the next three months. (Doc. Nos. 245-3; 266 at ¶ 7.)

A.      Olmstead's Arrival at the FCJC and Examination

On June 19, 2015, Olmstead was arrested and booked into the FCJC. (Doc. No. 267 at ¶ 1.) According to Olmstead, he informed the booking officer that he was taking "lots of samples" of Lisinopril and Clonidine for "severe hypertension." (Id. at ¶ 2; Doc. No. 270-2 at ¶ 2.) However, Olmstead's Inmate Medical Form indicates the only medications he disclosed were "Lythum (sic)"

---

[3] A blood pressure reading consists of a systolic (higher) number over a diastolic (lower) number. In 2015, the accepted threshold for high blood pressure for people under the age of 65 was 140/90. See Harvard Medical School, Reading the New Blood Pressure Guidelines (April 2018), available at https://www.health.harvard.edu/heart-health/reading-the-new-blood-pressure-guidelines (last accessed April 8, 2019).

[4] During his deposition, Olmstead repeatedly stated that he had couldn't remember and had "no idea" whether his primary care provider discontinued the Lisinopril, but he conceded that he had no reason to doubt the records. (Doc. No. 254-4 at 66-67.) He said he "may or may not" have had leftover Lisinopril that he was taking, but, again, he really "can't tell you." (Id. at 67.)

and "Tredazone (sic)."[5] (Doc. No. 257.)

FCJC COs did not receive training on handling most medical issues, including high blood pressure. (Doc. No. 270-5 at 23.) Instead, SHP was the contracted medical care provider for the FCJC, and Nurse Martin was assigned by SHP as the jail nurse. (Doc. No. 270-3 at 33.) On the same day that Olmstead was booked into the FCJC, Nurse Martin examined Olmstead and performed the required Inmate Physical. (Doc. No. 267 at ¶ 5.) In the "Medical History" section of the History and Physical Form, Nurse Martin recorded that Olmstead reported "no" for every single category, including "hypertension."[6] (Doc. No. 258 at 2.) Under assessment notes, Nurse Martin wrote, among other things, "vision good." (Id.) This form was marked with the initials of Nurse Martin's supervisor, Nurse Practitioner Karen Baker Bennett, on June 20, 2015.[7] (Id.) Nurse Martin checked Olmstead's blood pressure on June 20, 2015, and it was normal – 130/80. (Doc. No. 270-2 at ¶ 3.)

---

[5] Olmstead contends that this document does not have his signature at the bottom of the first page. (Doc. No. 267 at ¶ 3.) That is true, but it is a two-page document, and the place for his signature is at the end, which can fall on the first or second page depending on the information entered. Olmstead does not allege that the signature is a forgery. The time and date of this form were automatically generated by the FCJC computer system at the time of Olmstead's booking and the entries on the form could not be altered after the fact. (Doc. No. 254 at ¶ 3.)

[6] During his deposition, Nurse Martin testified that he had memory of Olmstead having high blood pressure during prior incarceration at the FCJC. (Doc. No. 270-3 at 9-11.) However, Nurse Martin testified that Olmstead only divulged being on psychiatric medications upon admission and did not raise any additional concerns, so in his mind there was no reason for him to do any initial follow up regarding blood pressure medication at that time. (Id.) Martin's medical records from prior stays at the FCJC show on-again, off-again treatment for high blood pressure, including numerous normal blood pressure readings. (See Doc. No. 245-1.)

[7] Bennett, a doctorate-prepared nurse practitioner, was considered the "Medical Director" of the FCJC. She was able to authorize prescriptions and had a collaborative agreement with a Tennessee physician for prescriptions for controlled substances. (Doc. Nos. 270-4 at 16-20; 270-5 at 27.)

B.     July 9, 2015 Request for Medical Treatment

Olmstead did not submit any sick call slips for medical complaints between his booking into the FCJC on June 19, 2015 and July 9, 2015. (Doc. No. 266 at ¶ 15.) On July 9, 2015, Olmstead filled out a sick call slip seeking medical treatment for a headache and a toothache. (Doc. No. 267 at ¶ 8.) Olmstead was seen by Nurse Martin the very next day – July 10, 2015. (Id. at ¶ 9.) As part of his examination, Nurse Martin measured Olmstead's blood pressure at 140/112. (Doc. No. 259 at 1.) According to Nurse Martin's deposition testimony, he reviewed Olmstead's record and saw that Olmstead had taken both Clonidine and Lisinopril at one time. (Doc. No. 245-5 at 89.) Nurse Martin requested a prescription of .1 mg Clonidine nightly. (Id.) Nurse Practitioner Bennett confirmed during her deposition that it would be appropriate for the nurse in such a situation to consult her; according to her, treatment for this level of high blood pressure would vary depending on symptoms and circumstances. (Doc. No. 270-4 at 8.) On the treatment form, Nurse Martin also checked the boxes for "medical monitoring" and "advised [patient] to notify staff of any changes." (Doc. No. 259 at 2.) Nurse Martin understood the former to mean that COs should contact medical personnel if the prisoner made a relevant medical complaint.[8] (Doc. Nos. 259; 270 at 58-59.) Olmstead began receiving the prescribed Clonidine the very next day – July 11, 2015. (Doc. No. 268 at ¶ 10.) The treatment form was also initialed by Nurse Practitioner Bennett on July 11, 2015.[9]

---

[8] While Nurse Martin was not at the jail full-time, prisoners could submit sick call slips at any time or call prison staff in the event they needed immediate medical attention.

[9] Olmstead attempts, but fails, to create a dispute of fact by asserting that Nurse Practitioner Bennett testified that she would "never" have prescribed Clonidine for high blood pressure. (See Doc. No. 266 at ¶ 19.) However, the citation offered by Olmstead is to a portion of Bennett's deposition in which she discusses a totally different topic. See Emerson v. Norvartis Pharm. Corp., 446 F. App'x 733, 736 (6th Cir. 2011) (noting that "judges are not like pigs, hunting for truffles" that might be buried in the record) (citing United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991). Defendants highlight that Bennett's alleged testimony never appears in her deposition *at all*. (Doc. No. 273 (citing Doc. No. 245-1).) Bennett actually explained that Nurse Martin "needs

(Doc. No. 259 at 2.) Olmstead did not make any complaints of a changed or worsened condition to COs or prison medical staff from July 11, through July 19, 2015. (Doc. Nos. 266 at ¶¶ 20, 22.)

C.     July 19-20, 2015 Request for Medical Treatment

Olmstead filled out a sick call slip on July 19, 2015. (Doc. No. 254-6.) On it, he listed his complaint as "blood pressure, depression." (Id.) Early the next morning, on July 20, 2015, Olmstead awoke to a pounding headache despite having been given his dose of Clonidine the previous night. (Doc. No. 267 at ¶ 12.) Olmstead claims that, at approximately 5:00 a.m., he told COs Densmore and York that he needed his blood pressure checked, but they ignored him because they were too busy serving breakfast. (Id. at ¶¶ 13-16.) Densmore and York's shift ended at 6:00 a.m. (Doc. No. 268 at ¶¶ 15-16.)

A few hours later, Plaintiff pressed the intercom button and, going by the shift log, he thinks CO King responded. (Doc. No. 268 at ¶ 17.) He claims he told the person who responded that his head was hurting and his vision was starting to get "real foggy." (Id. at ¶ 18.) According to Olmstead, COs King and Stockton responded and took his blood pressure. (Id. at ¶ 19.) COs King and Stockton confirmed this during their deposition testimony. (Doc. Nos. 253-2 at 12; 270-11 at 13.) At 8:41 a.m., the COs recorded a blood pressure reading of 180/100 in the FCJC logs. (Doc. No. 268 at ¶ 20.) COs King and Stockton did not notify Nurse Martin of Olmstead's blood pressure reading because Nurse Martin had instructed them that they did not need to do so unless

_____

an order for every medicine. . . . [I]f it's in the protocol book, then he can go ahead and give it. If it's not, then he needs to contact me." (Doc. No. 270-4 at 123.) Bennett clarified during her deposition that she gave all her nurses "permission to give Clonidine for a blood pressure above certain parameters." (Id. at 124.) Of course, Bennett initialed the treatment form that contained the order for Clonidine, confirming and authorizing Nurse Martin's decision. (Doc. No. 259 at 2.) Olmstead also erroneously cites to the Declaration of Renee Dahring, his nursing expert, for the proposition that Nurse Practitioner Bennett did not order the Clonidine, because, according to her expert Declaration, Dahring did not even review Bennett's deposition to gain knowledge as to what Bennett did or did not authorize. (Doc. No. 270-7 at 3-4.)

a prisoner had a diastolic reading greater than 100. (Doc. Nos. 270-11 at 13-14; 270-9 at 12-13.) According to CO King, this was based on a general "protocol" that Nurse Martin had implemented with the COs after one of them had called him – regarding a different prisoner – after obtaining a blood pressure reading of 140/96. (Doc. No. 270-9 at 12-13.) Jail Administrator Price explained that this was a "standing order by medical staff" that "if the [diastolic] number was over 100, the [COs] were to call the nurse." (Doc. No. 270-14 at 2.) Nurse Practitioner Bennett testified that she was not aware of Nurse Martin's protocol, and she instead would implement a more flexible policy in which COs were instructed to call the nurse if it was needed as opposed to applying such specific parameters. (Doc. No. 270-4 at 81-83.)

Olmstead claims that later that morning, when he was outside for recreation, he spoke to Administrator Price and asked when the nurse would arrive. (Doc. No. 268 at ¶¶ 22-24.) Olmstead further claims that he began to feel worse around lunchtime and fellow inmate Lewis Whited tried to get someone to help him. (Id. at ¶ 25.) According to Olmstead, his head and eyes hurt, and he was having trouble seeing and walking. (Id. at ¶¶ 26-27.) He testified during his deposition that he told the COs serving lunch – who he believed were COs King and Lance – about his condition and said that he needed to see the nurse. (Id. at 28.) Olmstead claims they were nice about it; they told him to fill out a sick call slip because the nurse would be there around 3:00 p.m.[10] (Id. at ¶ 29.) Later, Olmstead asked for the nurse again. (Id. at ¶ 32.) He says he saw Nurse Martin walk by his cell pod, but not stop. (Doc. No. 270-2 at ¶ 12.) Olmstead maintains that he was even told that the nurse had left for the day. (Id. at ¶ 13.) As a result, he says that he asked to again speak with Administrator Price, and he repeated his concerns. (Id. at ¶ 14.) Olmstead states that Price "said

---

[10] Olmstead testified that he did fill out a second sick call slip (although the only one on file at FCJC is the one dated the day before). (Doc. No. 268 at ¶ 31.)

she would have to talk to [Defendant Cravens]. She left then shortly thereafter returned. [Price] said [Cravens] had said I 'would be fine and to leave his correctional officers alone.'" (Id.) Price denies this later conversation occurred and maintains that Cravens had no knowledge of Olmstead's medical issues prior to being informed, after the fact, of his transport to the emergency room. (Doc. No. 242-1 at ¶¶ 6-9.) Later that afternoon, Olmstead says that he saw CO Chris Martin and told him that he was losing vision and his head was "killing him." (Doc. No. 268 at ¶ 37.) CO Chris Martin then went to the front to speak with the nurse about Olmstead for five to ten minutes. (Doc. No. 268 at ¶ 41.) According to Olmstead, when CO Chris Martin then took him to the booking area, Nurse Martin was not there and CO Tammy King measured his blood pressure at 240/190 and gave him a Clonidine.[11] (Doc. Nos. 253-1 at 117-118; 270-2 at ¶¶ 15-16.) According to Defendants, CO Chris Martin brought Olmstead to Nurse Martin, who took the 240/190 blood pressure reading and gave the Clonidine.[12] (Doc. No. 266 at ¶¶ 28-29.)[13]

---

[11] In its original Responses to Plaintiff's Requests for Admissions, Fentress County stated that CO King checked Olmstead's blood pressure at 5:15 p.m. (Doc. No. 270-10 at 6.) During her deposition, however, CO King clarified that she did *not* take Olmstead's blood pressure then. (Doc. No. 270-9 at 13.) Counsel for Fentress County has represented that this initial discovery response was made before CO King clarified the sequence of events that day.

[12] The Daily Shift Tower Log explicitly indicates the presence of Nurse Martin (Doc. No. 254-4), and CO Chris Martin testified to this version of events in his deposition (Doc. No. 270-16 at 18). The FCJC's computerized time records show Nurse Martin began work at 3:31 p.m. that day and worked until 8:29 p.m. (Doc. Nos. 245-7 at 59-60; 245-8.) Importantly, Nurse Martin completed a "Clinical Pathway Patient Clinical Data Form" dated July 20, 2019, in which Olmstead's blood pressure was recorded as 240/190, Olmstead's physical complaints were noted, clinical assessment results were noted, his current medication (Clonidine) was recorded, and the order "send to ER to be eval" was written. (Doc. No. 245-1 at 29-30.) This form was also subsequently initialed by Nurse Practitioner Bennett.

[13] The question of who took Olmstead's blood pressure at 5:00 p.m. is ultimately not material to resolution of the instant motions, for two reasons. First, because the parties separately maintain that King and Martin did essentially the *same thing* – measure Olmstead's blood pressure, give him a Clonidine, and send him to the hospital. Second, as discussed below, in any event, actions of FCJC personnel between approx. 5:00-5:30 p.m. do not alter the deliberate indifference analysis discussed below.

D.    <u>Treatment at Jamestown Medical</u>

Within minutes of the 240/190 blood pressure measurement, the decision was made to transport Olmstead from the FCJC to Jamestown Medical for additional treatment. (Doc. Nos. 267 at ¶ 25; 253-1 at 118; 270-2 at ¶ 16; 270-3 at 55.) FCJC personnel did not call an ambulance; rather, CO Chris Martin transported Olmstead to the hospital in a patrol car without lights or sirens.[14] (Doc. No. 270-2 at ¶ 19.) CO Chris Martin testified that he did not call an ambulance because (1) he was not instructed to do so by the nurse and (2) most of the time an ambulance is called "it's very severe, somebody is bleeding, unconscious, you know, about to die." (Doc. No. 253-3 at 22-23.) Administrator Price testified that an ambulance is only used in urgent cases like "if a woman is having a baby," and "normally, [FCJC] transport[s] by vehicle." (Doc. No. 270-8 at 35.) CO Chris Martin and Olmstead arrived at the hospital at 5:33 p.m. (Doc. No. 267 at ¶ 28.) According to Olmstead, CO Chris Martin informed the hospital staff of the 240/190 blood pressure reading and of Olmstead's complaints. (<u>Id</u>. at ¶¶ 28-29.)

Jamestown Medical records indicate Olmstead's presenting complaint as uncontrolled hypertension and note his recent blood pressure reading at the FCJC. (Doc. No. 261.) However, the triage assessment reveals that Olmstead appeared in "no apparent distress," complained of 5 out of 10 chest pain, denied fatigue, and denied lightheadedness. (<u>Id</u>. at 2.) It further noted that Olmstead was taking four medications, including Clonidine, Trazodone, and Lithium.[15] (<u>Id</u>.) Olmstead's blood pressure was measured by the hospital at 172/119. (<u>Id</u>. at 3.) He was

_____

[14] CO Chris Martin first had to jump-start the battery of that vehicle, but testimony suggested that this did not take long. (Doc. Nos. 253-1 at 120; 270-2 at ¶ 19.) It is a five-minute drive from the FCJC to hospital. (Doc. No. 270-11 at 30.)

[15] These latter two medications are the ones that the FCJC listed Olmstead as having reported at booking.

administered .1 mg Clonidine, 20 mg Lasix, and 5 mg Vasotec. (Id. at 3-4.) By 6:59 p.m.,

Olmstead's blood pressure was down to 151/101. (Id. at 3.) At 7:34 p.m., it was 128/86. (Id.) There

was no discussion in the Jamestown Medical records of complaints regarding vision loss. (Doc.

No. 261 at 1-13.) The hospital records noted that Olmstead was positive for "chest pain" but

negative for "dizziness, gait disturbance, visual changes, [and] weakness."[16] (Id. at 6.) In the notes

of the physician's exam, he described "no acute changes" of the eyes. (Id.) The hospital noted that

Olmstead was "feeling better." (Id.) He received prescriptions and was discharged. (Id. at 13.) CO

Chris Martin returned Olmstead to the FCJC at approximately 8:00 p.m.[17] (Doc. No. 265 at ¶ 5.)

     E.    <u>Olmstead's Injury</u>

Olmstead claims a loss of the "center vision" in the right eye. (Doc. Nos. 267 at ¶ 38; 266

at ¶ 33.) He wears a patch over his eye and he is afraid of becoming permanently blind in that eye.

(Doc. No. 270-2 at ¶ 27.) On August 5, 2015, Olmstead was taken to the Eye Centers of Tennessee

to see an optometrist, where he complained about a "grey spot in the middle" of his right eye.

(Doc. No. 245-1 at 23.) The optometrist's "impressions" were (1) "subjective" visual disturbance

of right eye and (2) "hypertensive retinopathy." (Id. at 24.) On August 7, 2015, Olmstead was

---

[16] Olmstead received a chest x-ray and an ECG, both of which were clear. (Doc. No. 261 at 11-12.)

[17] There is a disputed issue of fact regard whether, in the days that followed, Olmstead received his medication as ordered. Olmstead claims, without corroboration, that he did not. (Doc. No. 270-2 at ¶ 23.) FCJC records indicate that Olmstead was given the Lisinopril prescribed by Jamestown Medical each day from July 22, 2015 until he was transferred to another facility on August 11, 2015. (Doc. Nos. 245-1 at 31 (July 22-31) and 20 (August 1-11); 267 at ¶ 6.) On an August 8, 2015 nurse evaluation form, it is noted that Olmstead commented that he "thought he BP meds [were] making me sick, but I know it ain't that now. I been taking it." (Doc. No. 245-1 at 21.) Regardless, this is not material to the Court's analysis below.

diagnosed by Southeastern Retina Associates with chronic branch retinal artery occlusion and hypertensive retinopathy.[18] (Doc. No. 270-19.)

SHP and Nurse Martin's medical expert Dr. George Lyrene filed a Declaration in which he stated that Olmstead's claim that he suffered visual loss as a result of elevated blood pressure on July 20, 2015 is "inconsistent with medical knowledge."[19] (Doc. No. 245-13.) Dr. Lyrene explains that branch retinal artery occlusion has "an extension list of possible causes, but hypertension is not on that list even as one of the uncommon causes." (Id. at 1-2.) Furthermore, Dr. Lyrene notes that, more generally, hypertensive retinopathy is "a sign of long-term ongoing elevation of blood pressure, and it does not directly affect visual acuity in most patient groups with the possible exception of diabetics." (Id. at 2.) Dr. Lyrene states that his professional opinion is that Olmstead's visual impairments related to hypertensive retinopathy and branch retinal artery occlusion were not "caused or contributed to by the medical treatment or management of his hypertension while he was incarcerated in the [FCJC] in 2015," particularly during the "episode of elevated blood pressure that occurred on July 20, 2015."[20] (Id.) Olmstead offers no evidence to counter this medical expert testimony.

---

[18] Olmstead has not introduced any evidence regarding the cause of these conditions.

[19] Dr. Lyrene is the former medical director for every correctional institution in Arkansas and Mississippi, and he has directly provided care for inmates in jails in Maryland, Maine, Massachusetts, South Caroline, New Mexico, Alabama, and Iowa. His experience ranges from medical issues facing small jail populations to those facing jail populations as large as 4,000 inmates.

[20] The Court notes that there is a Declaration in this case that has been the subject of a fair amount of wrangling before the Magistrate Judge – that of Michael Miller, a fellow FCJC inmate. Defendants secured a Declaration from Miller in which he recounts that Olmstead and Whited hatched a scheme to get Olmstead to the hospital on the ground of high blood pressure to obtain contraband. (Doc. No. 232-3.) To accomplish this goal, Miller says he witnessed Olmstead not take his medicine and become ill. (Id.) However, Miller states that Olmstead was not in the distress he or Whited have described, or ever made complaints about his vision before or after his hospital

II.     Legal Standard

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment requires that the Court view the "inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). After the movant has satisfied this initial burden, the nonmoving party has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" Matsushita, 475 U.S. at 587. If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-252 (1986). "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999) (citing Anderson, 477 U.S. at 247-49).

III.    Discussion

---

visit, until another inmate with one eye advised Miller that he could make money by suing. (Id.) While this Declaration would appear to raise a question of fact about Olmstead's entire story, it was not actually utilized as part of any summary judgment motion and is not necessary for the Court to resolve the issues before it.

The Eighth Amendment prohibits any punishment that violates civilized standards of decency or "'involve[s] the unnecessary and wanton infliction of pain.'" Estelle v. Gamble, 429 U.S. 97, 102-03 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). As relevant here, an Eighth Amendment violation occurs if a prison official acts with deliberate indifference to a prisoner's serious medical needs. Estelle, 429 U.S. at 104; Dominguez v. Corr. Med. Servs., 555 F.3d 543, 550 (6th Cir. 2009). "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick v. Thompson, 563 U.S. 51, 61 (2011). That is, it must be shown that the prison official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). A plaintiff must show the defendants had a "sufficiently culpable state of mind," Wilson v. Seiter, 501 U.S. 294, 297 (1991), to deny or purposely delay medical care or intentionally interfere with prescribed medical treatment, Estelle, 429 U.S. at 104-05.

As the Supreme Court has set forth, there is an objective and a subjective component to deliberate indifference. Objectively, a plaintiff must show "the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." Blackmore v. Kalamazoo Cty., 390 F.3d 890, 899 (6th Cir. 2004). However, in the case of "minor maladies or non-obvious complaints of a serious need for medical care," id. at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." Napier v. Madison Cty., Ky., 238 F.3d 739, 742 (6th Cir. 2001) (internal citation omitted); Day v. White Cty., Tenn., No. 2:16-cv-00002, 2017 WL 6309991, at *5 (M.D. Tenn. Dec. 11, 2017). This involves claims of delay in treatment that caused injury, loss, or handicap, and can involve claims of delayed administration of medication or missed doses of medication. Blackmore, 390 F.3d at 897-98.

"The subjective component requires [a plaintiff] to show that prison officials have 'a sufficiently culpable state of mind in denying medical care.'" Blackmore, 390 F.3d at 895 (quoting Brown v. Bargery, 207 F.3d 863, 867 (6th Cir. 2000)). This is done by establishing that the official being sued (1) "subjectively perceived facts from which to infer a substantial risk to the prisoner"; (2) "did in fact draw the inference'; and (3) "then disregarded that risk." Richko v. Wayne Cty., Mich., 819 F.3d 907, 915 (6th Cir. 2016) (quoting Rouster Cty. of Saginaw, 749 F.3d 437, 446 (6th Cir. 2014)). While a plaintiff "need not show that [a defendant] acted with the specific intent to harm" him, Phillips v. Roane Cty., Tenn., 534 F.3d 531, 540 (6th Cir. 2008), the defendant must have "recklessly disregard[ed] th[e] risk" to him. Dominguez, 555 F.3d at 550 (citing Phillips, 534 F.3d at 540); Finn v. Warren Cty., Ky., 768 F.3d 441, 452 n.2 (6th Cir. 2014). This is "a very high standard of culpability, *exceeding* gross negligence." Meier v. Cty. of Presque Isle, 376 F. App'x 524, 528 (6th Cir. 2010) (quoting Ross v. Duggan, 402 F.3d 575, 590 n.7 (6th Cir. 2004) (emphasis in original)).

A.    Individual Defendants

Olmstead must establish that the individual Defendants acted under color of state law and that their actions caused the violation of his federal right. 42 U.S.C. § 1983; Thomas v. Nationwide Children's Hosp., 882 F.3d 608, 612 (6th Cir. 2018). Because all the individual Defendants acted under color of state law, the Court focuses on the alleged deprivation of Olmstead's Eighth Amendment right to be free from deliberate indifference to a serious medical need.

1.    Individual Fentress County Defendants

All of the individual Fentress County Defendants move for summary judgment based on qualified immunity. A public official, including a CO, is entitled to qualified immunity from a suit for civil damages if either the official's conduct did not violate a constitutional right or if that right

was not clearly established at the time of the conduct. Godawa v. Byrd, 798 F.3d 457, 462-633 (6th Cir. 2015) (citing Saucier v. Katz, 533 U.S. 194, 201-02 (2001)). These Defendants argue both that no constitutional violation has occurred and no clearly established right is implicated. The Court agrees that Olmstead has not raised a triable question of fact concerning whether a constitutional violation has occurred.

First, Olmstead has not established the objective prong of deliberate indifference on the record before the Court. Because Olmstead challenges only the Defendants' actions between June 19, 2015 and August 11, 2015, the Court considers the medical need he experienced during that period. Santiago v. Ringle, 734 F.3d 585, 590 (6th Cir. 2013). For 19 days, after entering the FCJC with a normal blood pressure measurement on June 19, 2015, Olmstead made no medical complaints. On July 9, he made his first complaint – about a toothache and headache. He was not ignored; rather, he was seen by Nurse Martin the next day, found to have a somewhat elevated blood pressure of 140/112, and started on Clonidine. For the next 10 days, Olmstead made no further complaints. On July 19, he submitted a sick call slip that was stamped "received" by the FCJC on July 20. Giving Olmstead all possible inferences, on July 20 he attempted to attract the attention of several different COs (King and Stockton at breakfast; King and Lance at lunch; Administrator Price and Cravens (via Price) after lunch, and finally C. Martin in the afternoon) and asked for the nurse several times over the course of seven hours, saying he was having headaches and vision problems of varying degrees. During that time, Olmstead also went to recreation, which is where has says he encountered Price. Although there was a delay, Olmstead received full attention by 5:30 p.m; by then, his blood pressure had been measured twice (with increasing results), he had been given an extra dose of Clonidine, and he was transported to Jamestown Medical for evaluation in a squad car. The hospital gave Olmstead supplemental

medicine for approximately two hours and discharged him with the notation that he was "feeling better" and without noting any concerns about vision.

Accordingly, on the few occasions when problems were brought to their attention, FCJC and SHP personnel provided *some* care and treatment. Olmstead therefore disputes the *adequacy* of the treatment he received during the June 19, 2015-Aug 11, 2015 period. In such a case – i.e., involving a claim based on a prison's failure to treat a condition adequately – "medical proof is necessary to assess whether the delay caused a serious medical injury." Id. at 591 (citing Blackmore, 390 F.3d at 898; Napier, 238 F.3d at 742); see also King v. Alexander, 574 F. App'x 603, 606 (6th Cir. 2014) (when a plaintiff's claim "is simply an unrequited request for a specific type of medical treatment," the "failure to provide medical expert testimony to establish a causal link between [an] injury and the allegedly inadequate treatment . . . dooms [a] deliberate-indifference claim"); Blosser v. Gilbert, 422 F. App'x 453, 460-61 (6th Cir. 2011) (holding that a prisoner who was examined by staff at the prison and received medication and care but was not referred to a specialist for a month could not succeed without providing "verifying medical evidence of the detrimental effect of the delay"); Donnal v. Perez, Case No. 3:15-CV-1550, 2018 WL 1182516, at *3 (N.D. Oh. Mar. 7, 2018) (explaining that deliberate indifference must generally be demonstrated with medical expert testimony).[21] In his opposition, Olmstead does not address this principle. (See Doc. No. 270.)

_____

[21] The Court notes that, in limited circumstances, the objective component can be satisfied without expert testimony when a plaintiff establishes that a defendant did not provide treatment "within a reasonable timeframe" for an injury or illness that was readily apparent to a lay person and such delay "worsened or deteriorated" the medical condition. Blackmore, 390 F.3d at 899-900 (citing Napier, 238 F.3d at 742). However, "[t]he Sixth Circuit has since made clear that the ruling in Blackmore is an exception to the general rule requiring medical expert proof to substantiate an Eighth Amendment medical indifference claim." Donnal, 2018 WL 1182516, at *3. Here, where Olmstead was treated within a day of his escalating claims of headaches, dizziness, and vision problems, and was not noted to have any significant problems other than blood pressure (e.g.,

The record here contains no such proof. Olmstead has offered no evidence or opinion from his optometrist or any physician at Southeast Retina Associates that diagnosed his condition that connects it in any way with his treatment at the FCJC. In fact, curiously, Olmstead does not discuss that treatment, his diagnoses, or his prognosis *at all* in his opposition brief. (See Doc. No. 270.) This certainly does not establish a causal link between Olmstead's condition and the treatment he received at the FCJC. Even more important, Olmstead has offered no medical expert report and submitted no other objective medical evidence to establish a causal link or verify the alleged detrimental effect of the delay in any treatment Olmstead received during his short stay at the FCJC. The summary judgment record is also devoid of support Olmstead needs. There is no discussion in the Jamestown Medical records, including the hands-on physical exam, of complaints regarding vision loss in Olmstead's right eye. In fact, the hospital records noted that Olmstead was *negative* for "visual changes," and Olmstead's emergency room doctor specifically described "*no acute changes*" of the eyes. Beyond that, Defendants' medical expert, Dr. Lyrene, has opined in his completely unrebutted expert report that Olmstead's claim that he suffered center-eye visual loss as a result of elevated blood pressure on July 20, 2015 is "*inconsistent with medical knowledge.*" He further explains that Olmstead's diagnosis of branch retinal artery occlusion has "an extension list of possible causes, but hypertension is *not on that list* even as one of the uncommon causes."[22] Dr. Lyrene concludes that, in his professional opinion, Olmstead's treatment during the June 19, 2015-August 11, 2015 time period did not cause or contribute to vision

---

vision) by the hospital, this is not such a case. Compare with Blackmore, 390 F.3d at 900 (where plaintiff suffered for two full days of unrelenting pain and vomiting with classic signs of severe appendicitis before being taken for emergency surgery, obvious need for medical care was "sufficiently serious").

[22] Olmstead briefly attempts to discredit Dr. Lyrene because he is a consulting expert. The conclusions offered by Dr. Lyrene, however, obviously do not require a physical examination.

problems.[23] In the end, Olmstead offers no way to objectively connect his right center-eye blindness medical claim with his claim of inadequate treatment by FCJC personnel. Olmstead therefore has not provided sufficient evidence for a reasonable jury to conclude that he has satisfied the objective component of his Eighth Amendment claim.

That alone is sufficient, but Olmstead also cannot establish the subjective component of deliberate indifference. This must be addressed for each Defendant individually. Garretson v. City of Madison Heights, 407 F.3d 789, 797 (6th Cir. 2005). First are COs Densmore and York. Olmstead alleges that early on the morning on July 20, 2015, he complained to Densmore and York that his head was pounding, asked them to check his blood pressure, and they ignored him because they were serving breakfast. Densmore and York indeed did not measure Olmstead's blood pressure. As discussed above, the subjective component requires Olmstead to show that prison officials subjectively perceived facts from which to infer a substantial risk to the prisoner, did in fact draw the inference, and then disregarded that risk. Richko, 819 F.3d at 915. Importantly, a prison official's failure to alleviate a substantial risk that he *should* have perceived, but *did not*, is not actionable under the Eighth Amendment; to be liable, a defendant must have subjectively perceived a risk and disregarded it. Farmer, 511 U.S. at 838. According to the record, Densmore and York – whose shift ended at 6:00 a.m. on July 20 – never knew more than that Olmstead had a headache that day. Olmstead has introduced no evidence that Densmore or York perceived facts that Olmstead was at substantial risk, drew the inference, and disregarded that risk. That Densmore

---

[23] That Olmstead attempts to create a factual dispute regarding whether, in the days that followed his treatment at Jamestown Medical, Olmstead received his medication as ordered, compare Doc. No. 270-2 at ¶ 23 (Olmstead Declaration) with Doc. Nos. 245-1 at 31 (FCJC Medication Record July 22-31) and 20 (FCJC Medication Record August 1-11), does not affect this analysis because Olmstead also has not offered any evidence to suggest that inconsistent administration of medication during those several weeks after July 20, 2015 was the cause of his purported eye injury.

and York possibly should have noticed Olmstead was in distress from high blood pressure may have been poor job performance, but it is not the culpable state of mind required for deliberate indifference.

Next is CO Stockton. His only involvement is that he was present on July 20 when CO King measured Olmstead's blood pressure at 180/100, but he did not call Nurse Martin at the time pursuant to Nurse Martin's over-100-diastolic protocol. However, a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he "reasonably defer[s] to the medical professionals' opinions." McGaw v. Sevier Cty., Tenn., 715 F. App'x 495, 497 (6th Cir. 2017) (quoting Johnson v. Doughty, 433 F.3d 1001, 1010 (7th Cir. 2006)). The record does not contain any evidence that Stockton was or should have been aware that his lay understanding of this situation was superior to Nurse Martin's trained assessment. In retrospect, it is possible that Nurse Martin's protocol was suspect, but the question of whether Stockton acted with deliberate indifference is based on what *he* knew at the time. See Spears v. Ruth, 589 F.3d 249, 255 (6th Cir. 2009). Without any indication that Stockton could or should have assessed any deficiency in Nurse Martin's instructions at the time he gave them, Stockton could not have formed the requisite mental subjective mental state for deliberate indifference.

As a supervisory official, Administrator Price was "entitled to rely on medical judgments made by medical professionals responsible for prisoner care." Ronayne v. Ficano, 173 F.3d 856, 1999 WL 183479, at *3 (6th Cir. 1999) (table); Hamilton v. Oike Cty., Ky., Civil No. 11-99-ART, 2013 WL 529936, at *7 (E.D. Ky. Feb. 11, 2013) ("Non-medical prison officials, such as Jailer Scott, act reasonably when they rely on the judgment of the prison medical staff."); see also, e.g., Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) (holding that where a prisoner is cared for by medical personnel "a non-medical prison official will generally be justified in believing that the

prisoner is in capable hands" unless there is reason to believe that the medical staff is not treating or mistreating a prisoner). Because there is no record that Price had any complaints about Nurse Martin other than, perhaps, Olmstead's verbal complaints on July 20, that Price never checked to make sure that Olmstead had eventually been treated did not make her reliance on the jail medical staff unreasonable. Hamilton, 2103 WL 529936, at *7. Accordingly, Olmstead has not offered evidence from which a fact-finder could conclude that Price disregarded a serious medical risk with a sufficiently culpable state of mind.

The claim against former Sheriff Cravens is even more tenuous. Olmstead never spoke to Cravens. The claim rests solely on Olmstead's vague assertions that (1) he told Price he "needed to go to the hospital," and (2) Price told Olmstead that Cravens said he "would be fine and to leave his [COs] alone." This is simply insufficient evidence to determine the risk to Olmstead that Cravens perceived. Moreover, Cravens, like Price, was entitled to reasonable rely on the medical judgment and services of SHP and Nurse Martin. Finally, even if Olmstead could overcome those obstacles, "[s]upervisory liability . . . cannot attach where the allegation of liability is based upon a mere failure to act." Leach v. Shelby Cty. Sheriff, 891 F.2d 1241, 1246 (6th Cir. 1989). Rather, Olmstead has to raise a triable questionable of fact about whether Cravens "did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on," Bass v. Robinson, 167 F.3d 1041, 1048 (6th Cir. 1999); see also Peatross v. City of Memphis, 818 F.3d 233, 243 (6th Cir. 2016) (citing Gregory v. City of Louisville, 444 F.3d 725, 751 (6th Cir. 2006)) (plaintiff must demonstrate that supervisor defendant approved or knowingly acquiesced" in the unconstitutional actions of his subordinates, rather than just showing tacit approval). On the very few facts before the Court, there is no evidence that Cravens even knew what the FCJC staff were doing to Olmstead, let alone that he knowingly acquiesced in any specific course of action.

Next is CO Chris Martin. When Olmstead drew CO Chris Martin's attention in the late afternoon of July 20, Martin *facilitated* Olmstead's care by (1) going to talk to the nurse; (2) bringing Olmstead up front to be examined; and (3) bringing Olmstead to and from Jamestown Medical. No fact-finder could conclude, based on those facts, that CO Chris Martin deliberately disregarded a perceived risk to Olmstead.

Finally, there is CO King. As mentioned, CO King measured Olmstead's blood pressure with CO Stockton at 180/100 but, per Nurse Martin's protocol, did not notify him. Like CO Stockton, CO King was entitled to rely upon Nurse Martin's directions without forming the culpable subjective intent. McGaw, 715 F. App'x at 497. Taking all inferences in favor of Olmstead's version of events, CO King encountered Olmstead again at 5:00 p.m., when she measured his blood pressure, gave him a dose of Clonidine, and sent him to Jamestown Medical. In other words, CO King made sure he received care at that time. No fact-finder could conclude that, in so doing, CO King deliberately disregarded a risk to Olmstead.

In sum, Olmstead is unable to satisfy *either* the objective or subjective components of deliberate indifference for the individual Fentress County Defendants. This unquestionably precludes Olmstead, as a matter of law, from establishing that they violated the Eighth Amendment. As a result, there is no need to progress to the second prong of the qualified immunity analysis – whether there was a clearly established right. However, the Court notes that the individual Fentress County Defendants are likely entitled to qualified immunity on this ground as well. Although the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question *beyond debate*." Kisela v. Hughes, 138 S. Ct. 1148 (2018) (emphasis added) (quoting White v. Pauly, 137 S. Ct. 548, 551 (2017) (per curiam) (internal quotation marks omitted)). "In other words, immunity

protects all but the plainly incompetent or those who knowingly violate the law." Id. (internal quotation marks omitted). Critically, the Supreme Court has repeatedly instructed that courts are "not to define clearly established law at a high level of generality.'" City and Cty. of San Francisco v. Sheehan, 135 S. Ct. 1765, 1775-76 (2015) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Plumhoff v. Rickard, 572 U.S. 765, 778-79 (2014) (emphasis added). Plaintiff has the burden of showing the defendants are not entitled to qualified immunity. Smoak v. Hall, 460 F.3d 768, 778 (6th Cir. 2006) (citing Silberstein v. City of Dayton, 440 F.3d 306, 311 (6th Cir. 2006)). Olmstead fails to effectively deal with this subject in his opposition. However, generally asserting a high-level right to medical care on demand, or faster or better care, is insufficient. Given the limited information known to each of the individual Fentress County Defendants, Olmstead has not established that he had a clearly-established constitutional right to receive from any of them specific treatment to specific symptoms at a specific time. See White, 137 S. Ct. at 552 (plaintiff must "identify a case where an officer acting under similar circumstances . . . was held to have violated" the Constitution). Otherwise, Olmstead "would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Anderson v. Creighton, 483 U.S. 635, 639 (1987). For all these reasons, the individual Fentress County Defendants are entitled to qualified immunity and judgment as a matter of law.

2.    Nurse Martin

Nurse Martin has not moved for summary judgment on the basis of qualified immunity, but rather, on the substance of Olmstead's Section 1983 claim. The Court engages in the same

deliberate indifference analysis to determine whether there is a triable question of fact regarding whether an Eighth Amendment violation has occurred. Olmstead's individual constitutional claim against Nurse Martin fares no better. In addition to failing to satisfy the objective component of his Eighth Amendment claim (as explained above), Olmstead cannot establish a jury question regarding Nurse Martin's subjective state of mind.

Olmstead makes an amalgam of claims against Nurse Martin. For example, Olmstead claims that Nurse Martin should have better reviewed his history, examined him, and prescribed medicine; responded with better treatment to his complaints; had a better blood pressure monitoring protocol; better and more quickly seen and treated him on July 20, 2015; and better ensured his medication was provided after he returned from the hospital. (See Doc. Nos. 225; 270; 270-2.) All of these, however, are legally problematic because "[t]he subjective requirement is designed 'to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment.'" Rouster, 749 F.3d at 446-47 (quoting Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001)); Estelle, 429 U.S. at 106 (that a prison employee has "been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment"); Burton v. Kakani, 514 F. App'x 577, 579 (6th Cir. 2013) ("[M]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Furthermore, "[w]here a prisoner alleges only that the medical care he received was inadequate, federal courts are generally reluctant to second the medical judgment of prison officials." Jones v. Muskegon Cty., 625 F.3d 935, 944 (6th Cir. 2010) (emphasis added); see also Baker v. Stevenson, 605 F. App'x 514, 519 (6th Cir. 2015) ("[B]oth the Supreme Court and this court have rejected Eighth Amendment claims that second-guess the medical judgments of medical personnel."); Skelly v. Bridges, Case No.

3:18-cv-00430, 2018 WL 6249880, at *3 (M.D. Tenn. Nov. 28, 2018) ("[T]here is a distinction between cases where the complaint alleges a complete denial of medical care and cases challenging the adequacy of the care received: [w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."). Nor is deliberate indifference shown because a prisoner has a difference in opinion about his treatment or posits that alternative procedures might have better addressed his particular needs. Kirkham v. Wilkinson, 101 F. App'x 628, 630 (6th Cir. 2004); Graham ex rel. Estate of Graham v. Cty. of Washtenaw, 358 F.3d 377, 384 (6th Cir. 2004).

To establish a constitutional violation on inadequate medical treatment, a prisoner must show that the treatment was "so woefully inadequate as to amount to no treatment at all," or that the defendant otherwise gave treatment while "consciously exposing the patient to an excessive risk of serious harm." Alspaugh v. McConnell, 643 F.3d 162, 169 (6th Cir. 2011) (citing Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976)); McCain v. St. Clair Cty., 750 F. App'x 399, 403 (6th Cir. 2018) (same). Here, when Olmstead was at the FCJC and complained of medical problems, he received treatment. The summary judgment record reflects that Nurse Martin did not ignore Olmstead. The record includes physical forms, examination forms, and a medication order, all completed by Nurse Martin and initialed by Nurse Practitioner Bennett. Even if the Court adopts for purposes of summary judgment Olmstead's unsupported testimony that King, and not Nurse Martin, measured Olmstead's blood pressure at 5:00 p.m. on July 20, that would simply be evidence that Nurse Martin did not examine Olmstead, not evidence that Nurse Martin deliberately refused to examine him. Regardless of who measured Olmstead blood pressure shortly before he

was taken to Jamestown Medical, it simply cannot be said that Olmstead was "denied" care on that day or during his stay at the FCJC.

The record establishes that Nurse Martin's 100-diastolic reporting protocol, which delayed Olmstead's treatment on July 20 by some hours, was a standing policy that applied to all inmates. (See, e.g., Doc. Nos. 270-7; 270-8 at 6; 270-9 at 3-4.) While the policy may have been negligent, or even grossly negligent, Olmstead has not introduced evidence to establish that when Nurse Martin implemented that protocol he was aware of a substantial *risk to Olmstead* or that Nurse Martin's state of mind was *to disregard a risk to or harm Olmstead*. See Santiago, 734 F.3d at 593 (noting that "the mere existence of delay in receiving treatment is not enough for a jury to find deliberate indifference" and requiring a plaintiff to put forth additional evidence). Even Olmstead's nursing expert, Renee Dahring, offers nothing to support a conclusion that Nurse Martin had the requisite culpable state of mind. Dahring paints a picture of a medical professional who did not provide adequate care or care that met appropriate standards, based in part on inappropriate judgments and poor exercise of discretion. Indeed, her report – setting aside the extensive use of conclusory language and rote invocation of legal phrases – reads merely like a classic laundry list of complaints of negligence or malpractice. (See Doc. No. 270-7.) Likewise, Olmstead's prison operations expert, Jeff Eiser, opines only that the medical care Olmstead received violated the "standard of care" established by several industry health care standards. (Doc. No. 270-19 at 15-16.) This classic language of negligence, too, offers no factual basis upon which a jury could conclude that Nurse Martin had the necessary subjective intent.

Accordingly, evidence of Nurse Martin being a prison nurse in need of substantial improvement might indeed allow a medical malpractice claim, but it does not, without more, allow a jury to conclude that Nurse Martin perceived and recklessly disregarded a serious risk to

Olmstead. See Green v. Doe No. 1., No. 3:15-cv-00145, 2015 WL 1393226, at *3 (M.D. Tenn. Mar. 25, 2015) ("Deliberate indifference" is the reckless disregard of a substantial risk of serious harm; mere negligence, or even gross negligence, will not suffice.") (citing Farmer, 511 U.S. at 835-36); Comstock, 273 F.3d at 703 ("When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation."). Nurse Martin is therefore entitled to summary judgment.

B. Municipal Entity Defendants

Olmstead also asserts claims against Fentress County and SHP. Both Fentress County as a municipality and SHP as a private corporation that "perform[s] a traditional state function such as providing medical services to prison inmates" may be sued under [Section] 1983 as entities acting under color of state law. Rouster, 749 F.3d at 453 (quoting Street v. Corr. Corp. of Am., 102 F.3d 810, 814 (6th Cir. 1996)) (internal quotation marks omitted); see also Connick, 563 U.S. at 60; Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013). The deliberate indifference claims against Fentress County and SHP stand on a somewhat different footing than Olmstead's claims against the individual Defendants. A municipal entity cannot be held liable under Section 1983 simply because one of its employees violated the plaintiff's constitutional rights. Smith v. City of Troy, Ohio, 874 F.3d 938, 946 (6th Cir. 2017). Rather, a plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom. Monell, 436 U.S. at 694.

It is well accepted that "[t]here must be a constitutional violation for a [Section] 1983 claim against a municipality to succeed – if the plaintiff has suffered no constitutional injury, his Monell claim fails." North v. Cuyahoga Cty., 754 F. App'x 380, 2018 WL 5794472, at *6 (6th Cir. Nov.

5, 2018) (citing <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986)). However, "[w]hether and under what circumstances a municipality can be liable when the plaintiff suffered a constitutional violation but cannot attribute it to any individual defendant's unconstitutional conduct is a more complicated question – one that [the Sixth Circuit] recently noted in <u>Winkler v. Madison County</u>, 893 F.3d 877 (6th Cir. 2018)." <u>Id</u>. Unquestionably, there is language in appellate decisions suggesting that there can be no municipal liability where no individual defendant has violated the plaintiff's constitutional rights. <u>See</u> <u>Miller v. Sanilac Cty.</u>, 606 F.3d 240, 254–55 (6th Cir. 2010); <u>Watkins v. City of Battle Creek</u>, 273 F.3d 682, 687 (6th Cir. 2001). "That brush, however, paints too broadly." <u>Batson v. Hoover</u>, 355 F. Supp. 3d 604, 612 (E.D. Mich. 2018). The Court of Appeals has recently highlighted that courts "have interpreted <u>Heller</u> to permit municipal liability in certain circumstances where no individual liability is shown." <u>North</u>, 2018 WL 5794472, at *7. That might occur, for instance, "when a government actor in good faith follows a faulty municipal policy." <u>Winkler</u>, 893 F.3d at 900 (6th Cir. 2018) (quoting <u>Epps v. Lauderdale Cty.</u>, 45 F. App'x 332, 334 (6th Cir. 2002) (Cole, C.J., concurring)). Under that line of authority, if Olmstead could show that some policy, practice, or custom endorsed by Fentress County or SHP led to the violation of his constitutional rights, then he might be able to pursue a municipal liability claim even in the absence of being able to attribute the denial of care to any particular named individual defendant. <u>Batson</u>, 355 F. Supp. 3d at 612.

The Court first addresses Fentress County. "To show the existence of a municipal policy or custom leading to an alleged violation, a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." <u>Baynes v. Cleland</u>, 799 F.3d 600, 621 (6th Cir. 2015). The policy or custom

must be the moving force behind the violation of the federal right. <u>Burgess v. Fischer</u>, 735 F.3d 462, 478 (6th Cir. 2013) (citing <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481-84 (1986)).

Olmstead foremost seeks to hold Fentress County liable for its personnel following Nurse Martin's 100-diastolic blood pressure reporting protocol. (Doc. No. 225 at ¶ 60.) However, just as with individual defendants, the Court of Appeals has made clear that it is not unconstitutional for municipalities to rely on "judgments made by medical professionals responsible for prisoner care. In fact, most would find such a policy laudable in many respects. Not only does such a policy – like the one at issue in this case – allow prisoners to receive prompt health care from on-site doctors or nurses, it also ensures that an independent party, rather than a corrections officer, makes the critical decisions about whether and at what point a prisoner's medical needs are sufficiently severe that ambulatory care or hospitalization is warranted." <u>Graham</u>, 358 F.3d at 384 (citation omitted); <u>see also</u> <u>Winkler</u>, 893 F.3d at 901. "The fact that alternative procedures might [ ] better address[ ] [a prisoner's] particular needs does not show that the [County was] deliberately indifferent to his medical needs." <u>Graham</u>, 358 F.3d at 384. Because Fentress County could constitutionally contract with SHP to provide healthcare services to inmates at the FCJC, it follows that Olmstead cannot attach liability against Fentress County simply because it has a policy that non-medical FCJC employees implement a blood pressure reporting protocol given by SHP's Nurse Martin. <u>See id</u>. Furthermore, Olmstead has pointed to no evidence that Fentress County knew of and disregarded risks associated with Nurse Martin's protocol.[24] <u>Winkler</u>, 893 F.3d at 902.

---

[24] Even if the Court construes Olmstead's argument to be that Fentress County had a custom of "inaction" in the face of prolonged unconstitutional conduct by SHP, his argument would still fail because there is no allegation or evidence before the Court of (1) "a clear and persistent" pattern of unconstitutional conduct by [SHP] employees; (2) the municipality's "notice or constructive notice" of the unconstitutional conduct; (3) the municipality's "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) that the policy of inaction was the "moving force"

Olmstead's other theories of liability against Fentress County are all more "process" related – specifically, he complains about the FCJC (a) requiring inmates to complete sick call slips; (b) not having COs regularly monitor inmates' blood pressure when a nurse is not present; and (c) not properly documenting inmates' blood pressure. (Doc. No. 225 at ¶ 60.) Similar type claims concerning sick call requests, CO medical discretion, and recordkeeping were raised as municipal liability claims in <u>North</u>. There, even where responses to medical requests were sometimes delayed up to 24 hours, requests were "occasionally lost or inadvertently not responded to," documents that should have been in inmates' charts were lost, and there was "no backup system in place to ensure that mistakes were caught and corrected," the Court of Appeals concluded that such "variations and isolated failures or delays in delivery of care" amounted to "missteps rather than the kind of widespread, gross deficiencies that would support a finding of deliberate indifference." <u>North</u>, 2018 WL 5794472 at *9 (quoting <u>Daniel v. Cook Cty.</u>, 833 F.3d 728, 735 (7th Cir. 2016)). Here, similarly, Olmstead has not demonstrated systemic Fentress County deficiencies that rise to the level of deliberate indifference to serious medical needs in violation of the Eighth Amendment. Fentress County is therefore entitled to summary judgment.

Olmstead's claim against SHP is solely premised upon a failure-to-train theory. It mentions the "nurses placed in the FCJC," but specifically focuses only on Nurse Martin, who was assigned to the FCJC. (Doc. No. 225 at ¶ 61.) For this claim, Olmstead must demonstrate that the SHP nurses' training was "inadequate for the tasks [they were] required to perform, the inadequacy resulted from [SHP's] deliberate indifference, and the inadequacy actually caused, or is closely

---

of the constitutional deprivation." <u>See</u> <u>D'Ambrosio v. Marino</u>, 747 F.3d 378, 387–88 (6th Cir. 2014) (quoting <u>Doe v. Claiborne Cty.</u>, 103 F.3d 495, 508 (6th Cir. 1996)). This he has failed to do. Olmstead has made no record of SHP providing constitutionally inadequate medical care to inmates in the past, let alone that Fentress County was constructively aware of and thus tacitly approved such hypothetical unconstitutional conduct.

related to, [Olmstead's] injury." <u>North</u>, 2018 WL 5794472, at *9 (quoting <u>Shadrick v. Hopkins Cty.</u>, 805 F.3d 724, 738 (6th Cir. 2015)). Stated differently, "[t]he central question is whether SHP's failure to train its nurses to adhere to their legal duty to honor the constitutional right of inmates to adequate medical care amounted to SHP's deliberate indifference to the rights of inmates like [Olmstead] with whom SHP and its staff come into contact." <u>Shadrick</u>, 805 F.3d at 738 (quoting <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 388 (1989)).

Here, Olmstead's failure-to-train is inherently flawed because it rests solely upon Nurse Martin. As a matter of law, a failure-to-train plaintiff "cannot meet [his] burden of proof by showing that one nurse was unsatisfactorily trained . . . or that harm could have been avoided if the nurse had had better or more training, sufficient to equip [him] to avoid the particular injury-causing conduct." <u>Id</u>. (internal quotation marks omitted); <u>see also</u> <u>City of Canton</u>, 489 U.S. at 390-91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."); <u>Miller v. Calhoun Cty.</u>, 408 F.3d 803, 816 (6th Cir. 2005) ("Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability."). Even construing the SHP claim to encompass more than Nurse Martin does not save it. Assuming, *arguendo*, that Olmstead has raised an issue of fact regarding both (1) the absence of a training program and (2) whether SHP failed to train its employees to properly handle an inmate's recurring high blood pressure, Olmstead must also establish that the inadequacy of SHP's policies or supervision caused his injury. <u>Horn v. City of Covington</u>, Civil Action No. 14-73-DLB-CJS, 2018 WL 3865377, at *39 (E.D. Ky. Aug. 14, 2018) (citing <u>Shadrick</u>, 805 F.3d at 737). As discussed above, Olmstead has failed to make this causal showing. Specifically, (1) Olmstead has introduced no medical evidence to establish that the treatment he

received at the FCJC caused or is even related to his injury; and (2) adherence to the 100-diastolic reporting protocol only delayed Olmstead's treatment by approximately seven hours, at the end of which he was treated by the hospital and released after several hours in "good" condition.

The opinions of Olmstead's nursing and jail operations experts are, alone, insufficient to establish deliberate indifference by SHP because Olmstead "has neither provided evidence of past examples of constitutionally inadequate treatment of inmates by [SHP's] medical staff nor explained how [SHP's] training program's alleged weaknesses were so obvious as to put [SHP] on notice that a constitutional violation was likely." Winkler, 893 F.3d at 904; Plinton v. Cty. of Summit, 540 F.3d 459, 464 (6th Cir. 2008) (possible to show deliberate indifference through evidence of prior instances of unconstitutional conduct demonstrating that municipal entity had notice that the training was deficient and likely to cause injury but ignored it). Nor has Olmstead sufficiently explained how the quality of the medical training put anyone at SHP on notice that there would be an inadequate response to an inmate's medical emergency. Winkler, 893 F.3d at 903; see also Plinton, 540 F.3d at 464 (citing Bd. of Comm'rs of Bryan Cty., Ok. v. Brown, 520 U.S. 397, 409 (1997)) (to show deliberate indifference through evidence of a single violation of federal rights, must also show that municipal entity failed to train its employees to handle recurring situations presenting an obvious potential for such a violation). Indeed, Olmstead has not discussed SHP's training policies to any real extent.[25] Accordingly, the record does not support a jury finding that, based upon a failure-to-train theory, SHP had a policy or practice of deliberate indifference

---

[25] Nursing expert Dahring opines that Nurse Martin is generally negligent, but she says little about SHP's training except for one boilerplate reference to SHP's alleged failure to supervise Nurse Martin's "ministerial duties." (Doc. No. 270-7 at 5.) Prison operations expert Eiser discusses the training of jail staff, not SHP employees. (Doc. No. 270-19.)

to the serious medical needs of inmates like Olmstead. SHP is therefore entitled to summary judgment.

C.    State Law Claims

There remains Olmstead's state law claim for infliction of emotional distress ("IIED") against Administrator Price and COs King and Stockton. These defendants contend that Olmstead has failed to point to any behavior attributable to them that would rise to the level necessary for such a claim. (Doc. No. 251 at 8-10.) Olmstead does not respond to this argument – or mention these claims at all – in his opposition brief. (See Doc. No. 270.) This alone may be sufficient grounds to grant Price, King, and Stockton summary judgment on these claims. See, e.g., Hicks v. Concorde Career Coll., 449 F. App'x 484, 487 (6th Cir. 2011) (finding that "[t]he district court properly declined to consider the merits of [plaintiff's] claim because [plaintiff] failed to address it in . . . his response to the summary judgment motion"). However, the Court has nonetheless considered whether these defendants have "met [their] initial burden" on the motion. Stough v. Mayville Cmty. Sch., 138 F.3d 612, 614 (6th Cir. 1998). In doing so, however, the Court will not "sua sponte comb the record from the partisan perspective of an advocate for the non-moving party." Guarino v. Brookfield Twp. Trs., 980 F.2d 399, 410 (6th Cir. 1992). It is simply not the Court's role to "invent[ ] the riposte for a silent party." Id. at 407.

A Tennessee plaintiff must plead the following elements of an IIED claim: (1) intentional or reckless conduct; (2) conduct so outrageous that it is not tolerated by civilized society; and (3) conduct resulting in serious mental injury. Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997). "To say that Tennessee courts narrowly define 'outrageous conduct' would be something of an understatement." Doe v. Belmont Univ., 334 F. Supp. 3d 877, 903 (M.D. Tenn. 2018). The conduct must truly be "atrocious," "utterly intolerable," and "beyond all bounds of decency." Goldfarb v.

<u>Baker</u>, 547 S.W.2d 567, 569 (Tenn. 1977); <u>see also</u> RESTATEMENT (SECOND) OF TORTS, Section

46, Comment D. As the Tennessee Supreme Court has explained:

> In describing these elements, we have emphasized that it is not
> sufficient that a defendant has acted with an intent which is tortious
> or even criminal, or that he has intended to inflict emotional distress.
> A plaintiff must in addition show that the defendant's conduct was
> so outrageous in character, and so extreme in degree, as to go
> beyond all possible bounds of decency and to be regarded as
> atrocious and utterly intolerable in a civilized community.

<u>Lourcey v. Estate of Scarlett</u>, 146 S.W.3d 48, 51 (Tenn. 2004) (internal citations and quotation

marks omitted) (emphasis added). Thus, first, the standard is not whether *an aggrieved person*

(such as Olmstead) considers a party's actions to have been outrageous, but whether *a civilized*

*society* would find them so. And, second, a plaintiff must prove that the conduct is outrageous and

utterly intolerable in *character*, not just in *motive*. <u>Z.J. v. Vanderbilt Univ.</u>, 355 F. Supp. 3d 646,

685 (M.D. Tenn. 2018) (citing <u>Belmont Univ.</u>, 334 F. Supp. 3d at 903-04). In this way, a plaintiff

seeking damages for IIED must meet an "exacting standard." <u>Miller v. Willbanks</u>, 8 S.W.3d 607,

614 (Tenn. 1999). Furthermore, the following factors inform the analysis concerning a plaintiff's

claim that he or she has suffered a serious "mental injury":

> (1) Evidence of physiological manifestations of emotional distress,
> including but not limited to nausea, vomiting, headaches, severe
> weight loss or gain, and the like;
> (2) Evidence of psychological manifestations of emotional distress,
> including but not limited to sleeplessness, depression, anxiety,
> crying spells or emotional outbursts, nightmares, drug and/or
> alcohol abuse, and unpleasant mental reactions such as fright,
> horror, grief, shame, humiliation, embarrassment, anger, chagrin,
> disappointment, and worry;
> (3) Evidence that the plaintiff sought medical treatment, was
> diagnosed with a medical or psychiatric disorder such as post-
> traumatic stress disorder, clinical depression, traumatically induced
> neurosis or psychosis, or phobia, and/or was prescribed medication;
> (4) Evidence regarding the duration and intensity of the claimant's
> physiological symptoms, psychological symptoms, and medical
> treatment;

(5) Other evidence that the defendant's conduct caused the plaintiff to suffer significant impairment in his or her daily functioning; and (6) In certain instances, the extreme and outrageous character of the defendant's conduct is itself important evidence of serious mental injury.

Rogers v. Louisville Land Co., 367 S.W.3d 196, 209-10 (Tenn. 2012).

The Complaint contains no specific allegations to support this one-sentence claim. As discussed above, when King and Stockton measured Olmstead's blood pressure on the morning of July 20, 2015, they did not notify anyone pursuant to the 100-diastolic notification protocol implemented by Nurse Martin. In other words, they were following the instructions of the FCJC's medical professional. When Price encountered Olmstead on the afternoon of July 20 – whether or not she spoke with Cravens – she, too, was entitled to presume that Olmstead 's care was or would be managed by jail medical personnel, and to rely on their professional judgment. At 5:30 p.m. on July 20, assuming Olmstead's version of events to be true, King measured Olmstead's blood pressure again at 240/190, gave him a Clonidine, and sent him to Jamestown Medical for treatment. The Court concludes that a jury simply could not find that these actions, alone or in combination, was so outrageous in character to go beyond all bounds of decency and to be regarded as utterly intolerable in character to be fundamentally unacceptable in a civilized community. Because this is the case, the Court need not analyze whether there is any evidence Olmstead has suffered a "severe" mental injury as defined under Tennessee law. The Court will grant Price, King, and Stockton summary judgment on the IIED claim.

IV.    Conclusion

For the foregoing reasons, (1) Defendants Cravens, Price, Densmore, York, Stockton, Chris Martin, and King and entitled to qualified immunity on the Section 1983 claim; (2) Defendants Fentress County, Nurse Anthony Martin, and Southern Health Partners, Inc. are entitled to

summary judgment on the Section 1983 claim; and (3) Defendants Price, Stockton, and King are entitled to summary judgment on Olmstead's state law claim for intentional infliction of emotional distress. Accordingly, all four Motions for Summary Judgment (Doc. Nos. 239; 245; 247; 250) will be granted.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE